EL PUEBLO, DEMANDANTE Y APELADO, *v.* TORRES, ACUSADO Y APELANTE.

No. 2128.—*Visto:* Diciembre 11, 1923.   *Resuelto:* Mayo 26, 1924.

CREDIBILIDAD DEL TESTIGO—REPREGUNTAS PARA ATACAR LA CREDIBILIDAD DEL TESTIGO.—Debe permitirse gran liberalidad en el examen de repreguntas de un testigo con el fin de poner a prueba su exactitud y credibilidad, y cuando las preguntas hechas parecen referirse a hechos y circunstancias dentro del alcance general del interrogatorio directo, se comete error al excluirlas.

ID.—ID.—NOTAS TAQUIGRÁFICAS ANTE EL GRAN JURADO.—Cuando las notas taquigráficas de la investigación ante el gran jurado pasan a la corte se convierten en documento público; y si bien no pueden ser ofrecidas directamente como prueba, pueden ser usadas para fines de repreguntas; por lo tanto, es erróneo privar al acusado de su derecho a impugnar la declaración de un testigo por el motivo de que el testigo había hecho declaraciones ante el gran jurado inconsistentes con su actual declaración.

SENTENCIA de *R. Díaz Cintrón,* J. (Ponce), denegando un nuevo juicio y condenando al acusado a 8 años de presidio, por homicidio voluntario.   *Revocada la sentencia y concedido un nuevo juicio.*

*F. B. Fornaris,* abogado del apelante; *José E. Figueras, Fiscal,* abogado del apelado.

El Juez Asociado Señor Wolf, emitió la opinión del tribunal.

La prueba tendió a establecer que el apelante Gómez y el interfecto Cambrelein eran enemigos y que sus diferencias surgieron debido a la relación que cada uno de ellos tenía con el trabajo del municipio de Ponce, donde Cambrelein era sobrestante y Gómez alegaba ser el carpintero. Un amigo de ambos, de apellido Torres, llevó a Gómez a casa de Cambrelein para reconciliar a los dos hombres. La prueba también tiende a demostrar que Gómez fué a la casa de Cambrelein armado de un cuchillo o punzón y que en la casa fué visto el punzón en su persona por un testigo quien avisó ese hecho a Cambrelein por medio de señas. Cuando Gómez, el acusado, y Torres llegaron a la casa de Cambrelein este último los recibió agradablemente y les dijo que se sentaran. Casi inmediatamente, sin embargo, surgió una diferencia sobre si Gómez era o nó el carpintero del municipio y Cambrelein negó o dudó si Gómez era tal carpintero. Sobre esto Gomez dijo que si Cambrelein estaba vivo le debía la vida a la tolerancia de Gómez, o palabras como ésas. Torres, viendo que su misión había fracasado, logró sacar a Gómez de la casa de Cambrelein por la escalera o hacia abajo, según fuere. Todos los testigos prácticamente están acordes en que Gómez al retirarse y antes de hacerlo, insultó desafió y continuó insultando y desafiando a Cambrelein. Este último, sin embargo, le siguió hacia abajo y según después quedó probado, estaba armado de un revólver que nadie sabía que tenía. El campo abajo estaba oscuro y muy poco alumbrado. Los dos hombres se encontraron en esta parte apenas alumbrada y Cambrelein, es evidente, falleció de una herida de cuchillo causada por Gómez. En el juicio Gómez fué declarado culpable de homicidio involuntario y sentenciado a la pena de ocho años de presidio.

Toda la prueba es inconsistente con cualquier otra teoría que no sea la de que los disparos fueron hechos por Cambrelein y que uno de estos disparos hirió a Gómez. Gó-

mez mató a Cambrelein y sostuvo y declaró que lo hizo en defensa propia. La prueba del gobierno, no obstante, tiende a acreditar que todos los disparos fueron hechos después de separados los dos hombres o cuando ya no luchaban juntos.

Sostiene el apelante que no hubo prueba de homicidio involuntario. Sin embargo, cualquier muerte voluntaria por la cual no exista ninguna excusa legal y que no se demuestre que sea deliberada y premeditada cae dentro de la categoría del homicidio involuntario.

Tal vez hubo alguna prueba de la cual el jurado tenía derecho a creer que Gómez indujo a Cambrelein a bajar la cuesta para matarlo o quizás hasta que Gómez fué a la casa de Cambrelein con esa intención o idea reservada en su mente sujeta a lo que Cambrelein dijera o hiciera. Si Gómez tuvo tal intención en su mente un disparo hecho por Cambrelein no justificaría un homicidio en defensa propia. La cuestión principal en este caso, sin embargo, es si al acusado se le permitió en el juicio utilizar todos los recursos que la ley permite para sacar la verdad de los testigos.

Las notas taquigráficas tomadas en la sesión del gran jurado fueron archivadas con la acusación original y llegaron al poder del abogado del acusado en cuyo poder estuvieron durante gran parte del juicio. Un testigo del gobierno, Pericás, había declarado respecto a la forma en que Gómez salió de la casa de Cambrelein y en cuanto a los sucesos anteriores a esto. En el examen de repreguntas se le preguntó lo siguiente: "¿Vd. recuerda si durante la investigación que hizo el gran jurado en este mismo caso, en este mismo salón, entre el 19 de noviembre y ahora Vd. declaró bajo juramento ante el gran jurado que Ventura Cambrelein desde arriba y Andrés Torres Gómez desde abajo continuaron discutiendo, pero al verles a ellos en este estado no pudimos aguantar a Ventura?" El fiscal se opuso por el fundamento de que no se había establecido la debida base para la pregunta y la corte desestimó la objeción. El

testigo al mismo tiempo de hacerse la objeción dijo que no recordaba. El acusado entonces preguntó si era que el testigo no recordaba haber prestado la declaración o no recordaba lo que dijo. Antes de haberse hecho esta segunda pregunta el fiscal solicitó que la primera fuera eliminada. La corte manifestó que resolvería la moción de la eliminación antes de terminarse el juicio pero no lo hizo. La corte no permitió que la segunda pregunta fuera contestada.

Tanto el fiscal de la corte inferior como el de esta corte parecen estar bajo la impresión de que para poder confrontar e impugnar a un testigo con manifestaciones inconsistentes era necesaria mayor especificación que la que aparecía de la pregunta que hemos transcrito. La norma sería ver si el testigo fácilmente entendería la fecha, lugar y circunstancias por virtud de las cuales la alegada manifestación inconsistente se hizo. Se le dijo el lugar, aproximadamente la fecha, y la última se precisó haciendo una referencia a los procedimientos del gran jurado en el mismo caso. El testigo tuvo todas las oportunidades para conocer y entender la ocasión a que se hizo referencia, y según creemos no podía dejar de entenderla.

La corte excluyó la segunda pregunta basada en la teoría, según entendemos, de que las sesiones del gran jurado son secretas. Si la corte estuvo equivocada en esto, el apelante fué limitado indebidamente en su examen de repreguntas porque asumiendo que hubo una contradicción aparente en su declaración ante el gran jurado y el pequeño jurado el apelante tenía derecho a investigar un poco más. Si el testigo no recordaba haber declarado ante el gran jurado, esta falta impugnaría su memoria y si él dijo que no recordaba haber contestado la pregunta como se le hizo, todavía podría ser interrogado con respecto a cuál de las dos manifestaciones era verdad y habérsele dado una oportunidad de explicar. Si él dijo que no había hecho la alegada manifestación que se impugna, y era esencial, pudo haber sido contradicho en debida forma como luego veremos. He-

mos asumido que la pregunta original se hizo de buena fe,
como..sería la presunción, pues en verdad sería cosa muy
grave preguntar a un testigo acerca de una manifestación,
a menos que la manifestación real o aparentemente hubiese
sido hecha ante el gran jurado como lo revelan las notas
taquigráficas. Si las notas taquigráficas podían usarse de
algún modo, la corte incurrió en error al circunscribir el
derecho a hacer repreguntas. Artículo 2 de la Ley Orgá-
nica, a saber, que en todos los procesos criminales el acu-
sado gozará del derecho de carearse con los testigos de
cargo. La idea principal del careo es la oportunidad para
hacer repreguntas. Wigmore, Sec. 1398. Debe permitirse
gran liberalidad en el examen de repreguntas de un testigo
con el fin de poner a prueba su exactitud o credibilidad, y
cuando las preguntas hechas parecen referirse a hechos y
circunstancias dentro del alcance general del interrogatorio
directo, se comete error al excluirlas. *People* v. *Westlake,*
124 Cal. 452, y otros casos citados en el alegato del ape-
lante. La corte probablemente no hubiera limitado el exa-
men de repreguntas si hubiera creído que el abogado tenía
derecho a utilizar las notas taquigráficas en la forma pro-
puesta. Desde luego que si el abogado no tenía derecho a
usar las notas la corte no incurrió en error.

El abogado solicitó en términos generales que se le per-
mitiera usar las notas taquigráficas para interrogar a los
testigos y la corte en una orden razonada lo negó. Técni-
camente éste no es el modo de obtener el uso de las notas
taquigráficas ya archivadas y en poder del abogado, pero el
abogado debe hacer preguntas a los testigos como se hizo
en el examen del testigo Pericás. Debe hacerse constar, a
medida que se examine cada testigo, que hubo alguna con-
tradicción en su declaración en el salón de la corte y ante
el del gran jurado. Si el abogado no estaba tratando de
ofrecer manifestaciones inconsistentes, y especialmente si
nadie tenía ninguna idea de que un testigo había sido in-

consistente en su declaración, nada podría haber en las notas taquigráficas de ningún beneficio posible para la corte, el abogado, o la investigación de la verdad. Las notas taquigráficas nunca pueden ser usadas debidamente como un instrumento o medio de infundir temor a un testigo, sino que deben ser utilizadas únicamente con su fin legítimo de establecer la base de la contradicción. Sin embargo, el uso debido de las notas taquigráficas, suponiéndose que pueden usarse, se pretendió hacer en el interrogatorio del testigo Pericás y todo el caso después fué seguido por virtud de la teoría de que las notas de modo alguno no puedan utilizarse en el juicio, cuya actitud puede también haber impedido un interrogatorio amplio de los demás testigos. Examinaremos la ley del gran jurado.

Los artículos pertinentes de la misma son los siguientes:

"Sección 30.—Las sesiones del Gran Jurado serán secretas. El taquígrafo de la corte o un taquígrafo designado al efecto por la corte, con cargo a El Pueblo de Puerto Rico, podrá estar presente en las sesiones para tomar la prueba y transcribirla.

"Sección 31.—En la transcripción taquigráfica se consignarán los nombres de los jurados que intervengan en la investigación, la prueba aducida y resolución de cada cargo, y se trasmitirá íntegra a la corte debidamente certificada antes de la lectura de la acusación.

"Sección 32.—El fiscal podrá estar presente durante la investigación del Gran Jurado solamente para ofrecer las pruebas que tuviera; pero nunca durante la deliberación"

"Sección 34.—Todo miembro del Gran Jurado debe guardar secreto acerca de cuanto se haya dicho en las deliberaciones de éste y de la manera como hayan votado él o sus colegas; pero cualquier corte puede compelerle a descubrir el testimonio prestado por un testigo ante el Gran Jurado en los dos casos siguientes:

"1. A los efectos de juzgar si dicho testimonio es consistente con la declaración prestada ante dicha corte.

"2. En el juicio de una acusación por perjurio contra el testigo."

Aunque hay un momento oportuno para guardar secreto en el procedimiento del gran jurado, este momento pasa al formularse la acusación (*indictment*). Nos limitaremos a

hacer una referencia de Wigmore Sobre Evidencia y sus citas, a saber:

"Sección 2362 (*b*) *Privilegio de Testigos ante el Gran Jurado; Principio General.* Los testigos y denunciantes que comparecen ante el gran jurado deben estar garantidos temporalmente contra la revelación compulsoria de sus declaraciones y quejas, porque de otro modo el Estado no podría esperar obtener bastante cantidad de prueba para la acusación del gran jurado. El secreto es el aliciente del Estado para obtener prueba. La política es análoga a la del privilegio de informantes en general, (*post,* sec. 2374). El privilegio, por tanto, no es el del miembro del gran jurado, pues éste no es sino un intérprete indiferente de la declaración. Ni tampoco lo es enteramente del Estado, pues el interés del Estado es simplemente el motivo para constituir el privilegio. La teoría del privilegio es que el testigo está garantido contra una divulgación compulsoria; el privilegio debe por tanto ser el del testigo y descansa en su consentimiento.

"Pero claramente que el secreto que se garantiza es solamente temporal y provisional. El secreto permanente sería más de lo necesario para hacer que el testigo esté dispuesto. Además se iría demasiado lejos estableciendo una oportunidad para el abuso; toda vez que un testigo corrupto podría utilizarlo para hacer cargos falsos. Tanto como esto se admite ahora universalmente.

"1858, Bigelow, J. en el caso de Com. v. Mead, 12 Gray, 167: 'Por cuanto estos fines (que arriba se indican) se han cumplido, la necesidad y conveniencia de conservar el sello del secreto terminan. "Cessante ratione cessat regula." Después de formulada y presentada la acusación, y de estar el acusado obligado a contestar y el juicio ante el pequeño jurado se comienza, todos los hechos relativos al delito imputado y su prosecución están necesariamente expuestos y no puede surgir ningún daño a la causa de la justicia pública por no ocultar por más tiempo hechos que son esenciales y pertinentes a la cuestión litigiosa, meramente porque su revelación puede conducir al descubrimiento de alguna parte de los procedimientos ante el gran jurado. Por el contrario, gran dureza e injusticia podría ocasionarse a menudo privando a una parte de prueba importante que es esencial a su defensa, poniendo en vigor una regla de exclusión, cuyo origen y fundamento descansan en la política pública, después que las razones en las cuales esta regla se basa han dejado de existir. El presente caso suministra un buen ejemplo de la verdad de esta observación. No podrá ocasionarse ningún daño a los

intereses y los derechos del gobierno, a nuestro modo de ver, por una divulgación de la prueba aportada por el testigo ante el gran jurado. . . . Por otra parte es claro que los derechos del acusado podrían quedar afectados grandemente y aumentar mucho su peligro, si se le impide demostrar el hecho de que un testigo importante contra él no debe considerarse con gran cautela y duda, pues en una ocasión anterior, al ser llamado a declarar bajo juramento había hecho un relato distinto del mismo suceso, del que ha dado en su declaración en el juicio.'

"1893. McSherry, J. en el caso de Izer v. State, 77 Md. 110, 26 Atl. 282: 'Si los testigos que declaran falsamente ante el gran jurado están exentos de todo castigo por perjurio, meramente por el hecho del secreto del juramento del jurado el objeto que se persigue por esa disposición de su juramento quedaría pervertido y una medida cuyo fin era promover el bienestar público quedaría convertida en un medio para destruir los fines de la justicia. La ley no permite la obligación de secreto que se ha impuesto para un fin, que se utilice con otro objeto que es enteramente distinto. El juramento de secreto del gran jurado no puede por tanto interponerse para obstruir la administración de justicia.'

"¿Pero cuáles son los límites de este secreto temporal? La contestación es en principio que éste cesa cuando el gran jurado ha terminado con sus deberes y ha acusado, o exonerado a las personas acusadas. (1) Suponiendo que el gran jurado acuse a J. S. por la declaración de Doe, es evidente que el secreto ya no puede servir más, pues Doe será citado como testigo en el juicio y obligado a declarar. Si él dice la verdad y ésta es la misma que declaró ante el gran jurado, la divulgación de la anterior declaración no puede posiblemente causarle ningún daño (en la forma de daño material o mala voluntad) que su declaración en el juicio público no tienda igualmente a producir. Si, por otra parte, él declara ahora falsamente o declara verdaderamente, pero antes falsamente, él no es en manera alguna una persona que deba tener ningún privilegio. El privilegio, por tanto, no tiene más razón de existir. (2) Suponiendo, por el contrario, que el gran jurado después de oir la declaración de Doe exonere sin embargo a J. S. debe existir ahora un motivo para Doe desear el secreto,—como cuando en un juicio subsiguiente se desea impugnar a Doe como testigo demostrando sus manifestaciones de prejuicio contra J. S. ante el gran jurado. Pero aquí el privilegio también debe cesar por otra razón, o sea, que la oportunidad que tal divulgación tendrá es una contingencia demasiado pequeña para tener ningún efecto 'a priori' en hacer que Doe no quiera

formular queja o prestar declaración ante el gran jurado; Doe naturalmente habrá esperado que J. S. fuera acusado. Además, al ser citado Doe a un juicio civil que envuelve las mismas cuestiones que el proceso criminal, y se desea impugnar a éste con su declaración anterior, todo motivo de secreto concluye por las mismas razones anotadas en el párrafo (1) *supra*. Además, en las otras raras contingencias en las cuales su declaración ante el gran jurado podría haber sido pertinente (*post,* sec. 2363, párrafo 2) la justicia requiere en cualquier caso que Doe no sea exonerado de la divulgación.

"No quedan, por tanto, en principio, ningunos casos en los cuales *después que las funciones del gran jurado han terminado,* el privilegio de los testigos a que sus declaraciones no sean reveladas, debe considerarse que continúa. Esta es, en efecto, la ley como ha sido aceptada hoy generalmente. Sin embargo, no ha sido ordinariamente expuesta en una forma tan amplia. La frase corriente es que la divulgación puede ser necesaria '*siempre que resulte necesaria en el curso de la justicia.*' Haciendo caso omiso de algunas excepciones locales, en la práctica ésta no es una regla más estricta que la antes referida inferible del principio." 5 Wigmore Sobre Evidencia, párrafo 2362, p. 152."

El artículo 31 es demasiado claro para ser discutido. Las notas taquigráficas deben ser trasmitidas a la corte y por tanto se convierten en un documento público. El artículo 34 tiene por fin la comparecencia de uno de los mismos jurados.

Iowa y Wisconsin son Estados que tienen leyes semejantes y sus cortes han hablado. *Havenor* v. *State,* 125 Wis. 444, 104 N. W. 116; *State* v. *Woodward,* 132 Iowa, 675, 108 N. W. 753. El resultado final de estas decisiones y otras que hemos examinado es que las notas taquigráficas pueden ser usadas para fines de repreguntas; que aunque el documento que contiene las notas taquigráficas no puede ser ofrecido directamente como prueba puede ser usado por el testigo cuya declaración se impugna para refrescar su memoria, y que tal testigo puede ser el mismo taquígrafo o un miembro del gran jurado.

Resulta, pues, que la corte incurrió en error al limitar el

alcance del examen de repreguntas del testigo Pericás y que la corte estuvo enteramente equivocada en su actitud hacia las notas taquigráficas.

El abogado hizo un señalamiento de error en términos generales en cuanto a las instrucciones y tendríamos derecho a no considerarlo.   La corte, aunque finalmente dió las debidas instrucciones, parecía tener cierta impresión de que la defensa propia que justifica el quitar la vida a un ser humano surgía sólo en defensa de la propia vida de una persona.   Sin embargo, según manifestó luego la corte, el temor de grave daño corporal es bastante.   Dudamos, además, a menos que no exista una razón especial para ello, si después de decir al jurado que al acusado debe tratarse como a cualquier otro testigo, debe decírsele que este principio era cierto "teniendo en consideración el interés natural que él puede tener."   El jurado puede hacer la inferencia necesaria por sí mismo.   Los demás señalamientos de error han sido tratados incidentalmente.

*Debe revocarse la sentencia apelada y devolverse el caso para la celebración de un nuevo juicio.*